## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **DIGITAL GLOBE SERVICES, INC.,** ) | |
| 316 Wilcox St. Castle Rock, CO 80104 ) | **Case No.** |
| **Plaintiff,** ) | |
| **v.** ) | |
| **CEQUEL COMMUNICATIONS, LLC,** ) | |
| **d/b/a Suddenlink Communications,** ) | **JURY TRIAL DEMANDED** |
| 520 Maryville Centre Drive, Suite 300, ) | |
| St. Louis, MO 63141 ) | |

## COMPLAINT

**COMES NOW** Plaintiff, Digital Global Services, Inc. by and through its undersigned counsel, and for its claims for relief against Defendant Cequel Communications, LLC d/b/a Suddenlink Communications, alleges and states as follows:

## PARTIES

1.     Plaintiff Digital Globe Services, Inc. ("DGS") is a duly formed Delaware corporation, in good standing, with its principal place of business in the State of Colorado with an address at 316 Wilcox St., Castle Rock, CO 80104.

2.     Defendant Cequel Communications, LLC ("Cable Company") is a limited liability company, doing business under the fictitious name "Suddenlink Communications," with its principal place of business in the State of Missouri with an address at 520 Maryville Centre Drive, Suite 300, St. Louis, MO 63141.

3.     Defendant Cable Company's members are not citizens of the State Colorado.

## JURISDICTION AND VENUE

4.      The parties have consented to the exclusive jurisdiction of this Court for resolution of disputes arising out of the Marketing Services Agreement (the "Agreement). *See*, **EXHIBIT A.**

5.      Therefore, pursuant to 28 U.S.C. 1391 and in accordance with the terms of their Marketing Services Agreement, page 8, paragraph 12(d) (Exhibit A), venue is proper in this District.

6.      Pursuant to 28 U.S.C. §1332, this Court has original subject matter jurisdiction of this matter based on diversity of citizenship and amount in controversy. Specifically, this action is between citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds Seventy-Five Thousand ($75,000.00) Dollars.

## FACTS COMMON TO ALL COUNTS

7.      The crux of this action is that Plaintiff DGS alleges that, for many years, Defendant Cable Company has underreported commissions due and owing to Plaintiff DGS. Plaintiff DGS, upon information and belief, alleges that Defendant Cable Company has achieved installation of services at a rate that approaches the industry norm of between 50% and 70%. Contrarily, Defendant Cable Company has self-reported abysmal installation rates of approximately 25% in 2013 and 26.5% in 2014. To that end, Plaintiff DGS alleges that Defendant Cable Company could not possibly be performing installations at a rate less than half of Defendant Cable Company's industry peers, i.e., Plaintiff DGS alleges that Defendant Cable Company cannot be performing so inadequately and unsuccessfully. Defendant Cable Company has insisted and continues to insist that it is performing at the lowest installation rate in the entire industry.

8.      Plaintiff DGS provides sales and marketing services to commercial enterprises through online sales and digital marketing of, among other things, certain consumer products, which include digital television services, high-definition television services, high-speed internet services and telephone services.

9.      Defendant Cable Company provides, installs and delivers digital television services, high-definition television services, high-speed internet services and telephone services to consumers through the brand "Suddenlink" (more than two services are herein referred to collectively as "Cable Company Services" and are herein referred to individually as a "Cable Company Service").

10.      Customers may subscribe or register for all Cable Company Services or, in some instances, register for a single Cable Company Service or a combination of Cable Company Services, e.g., HDTV and Internet.

11.      Providers engage marketing firms, such as Plaintiff DGS, to provide fully integrated customer acquisition services which include micro-targeting of potential customers, sales driven websites, specialized call centers with product pricing knowledge and other services which generate customer orders for the providers' services.

12.      The marketing firms, like Plaintiff DGS, in turn, generally receive a commission for each order of service or for each existing customer of the provider's services who upgrades services or adds new services of the provider. In the industry, these customers are referred to as "customer leads" or "customer orders."

13.      Historically, the service providers install these orders at the rate of between 52% and 70% for these customer orders.

3

14.     In today's world of easily available computers, millions of consumers turn to the internet to search for "deals" for television, internet and telephone services.

15.     On or about September 26, 2008, Plaintiff DGS (its predecessor, Digital Global Services, LLC, prior to converting to an incorporated status) and Defendant Cable Company entered into a Marketing Services Agreement, a true and correct copy of which is marked **EXHIBIT A**, attached hereto and incorporated fully by reference herein.

16.     The Agreement provides that Plaintiff DGS was an authorized online retailer and engaged by Defendant Cable Company to market Cable Company Services for the purpose of Plaintiff DGS procuring orders for a Cable Company Service or Cable Company Services and procuring current Cable Company customers for upgrades to existing Cable Company Services or registering for new or different Cable Company Services.

17.     The Agreement reflects a shift to online shopping by consumers and the marketing approach taken by industry peers to Defendant Cable Company to the online marketing channel.

18.     Under the Agreement, and similar ones in the cable industry, Plaintiff DGS performs its services under a "pay-for-performance" business model. This business model, as reflected in the Agreement, is comprised of Plaintiff DGS originating, developing and using proprietary algorithms to micro-target potential customers and then spending its own money on paid search and call center staff.

19.     Potential customers click on paid search advertising (and Plaintiff DGS incurs expense to, for example, *Google* for each click) and are taken to a DGS-designed and Suddenlink-approved website (the "Website") which displays and localizes Defendant Cable Company's Services, pricing, and terms specific to that customer's geographic area.

20.     Potential customers call DGS owned or managed call centers where a DGS call center agent attempts to sell the potential customer Defendant Cable Company's Services.

21.     When a sale is successful, the DGS call center agent enters an order for Defendant Cable Company's Services into an order entry system. These orders are then sent to Defendant Cable Company.

22.     Defendant Cable Company thereafter calls the potential customer to confirm the order and schedule a date for installing the Defendant Cable Company's Services. Under the "pay for performance" business model, Plaintiff DGS is only paid when Defendant Cable Company confirms to Plaintiff DGS that a customer has installed service.

23.     Plaintiff DGS exclusively relies upon Defendant Cable Company to report fully, accurately and truthfully performance and to use reasonable efforts to turn customer orders into customer installations.

24.     To this end, the Agreement provides, in pertinent part, that Plaintiff DGS would expend its own capital to create a fully integrated customer acquisition service with on-line marketing of Cable Company Services designed to generate orders and Plaintiff DGS would be compensated for each installation of the orders for Cable Company Services.

25.     Plaintiff DGS would provide customer orders for Defendant Cable Company and Plaintiff DGS would be paid a commission for each DGS Sourced Customer.

26.     Plaintiff DGS expended its capital creating and maintaining the fully integrated customer acquisition service for Defendant Cable Company, including building, maintaining and changing the Website, updating offers on the Website pursuant to Defendant Cable Company's direction, developing unique algorithms to micro-target potential customers, and

hiring and training call center agents to sell and enter orders for Defendant Cable Company's Services.

27.     Using certain defined search terms, paying for advertisement on *Google* and other search engines, using geographical information (such as zip codes), demographics and other identifiers, a consumer could click on an advertisement created by Plaintiff DGS and would be directed over the internet to Plaintiff DGS' Website featuring Defendant Cable Company's Services.

28.     A potential customer of Defendant Cable Company may visit the Website to get information about Cable Company Services or to "upgrade" the customer's current services by adding new features or, for example, changing services from analog television to High Definition Television.

29.     When the potential customer visited the Website, the customer would be shown several different offers for the Cable Company Services and invited to either call a toll-free number or enter and send information via a secured internet connection. The customer would agree to purchase a set of services, *e.g.*, internet and phone, and place the order with Plaintiff DGS. This interaction by the customer made the customer a "customer lead" or a "customer order."

30.     When customer orders were generated through Plaintiff DGS' Website or through customers calling Plaintiff DGS directly, Plaintiff DGS would enter the customer orders into a platform from which Defendant Cable Company could pull the leads instantly or as often as it liked.

31.     Under the Agreement, Defendant Cable Company was required to use "commercially-reasonable efforts" to call the potential customer to confirm the order and

schedule an installation of services. Specifically, Defendant Cable Company was required to use "commercially reasonable efforts" on all customer leads/customer orders provided by Plaintiff DGS as follows:

(a.)    Within 24 hours of receipt of each customer order by Defendant Cable Company of customer orders from Plaintiff DGS, Defendant Cable Company was required to use reasonable efforts to contact the customer via telephone, email or other medium;

(b.)    If Defendant Cable Company could not make contact with a customer order within the first attempt, Defendant Cable Company was required to make a "minimum of five (5) more attempts within three (3) business days following the date of first attempt."

32.    If a customer order registered for Cable Company Services or upgraded or added Cable Company Services through the efforts of Plaintiff DGS and the customer met certain defined criteria (as set forth in "Exhibit A: Commissions/Reporting" of the Agreement) the customer order would become a "DGS Sourced Customer," as defined in the Agreement.

33.    The Agreement requires Defendant Cable Company to pay to Plaintiff DGS a "commission" for all DGS Sourced Customers within thirty (30) days after the DGS Sourced Customer had the applicable Cable Company Services or Cable Company Service installed, to wit:

(a.)    For Cable Company's video services, Defendant Cable Company was required to pay to Plaintiff DGS a one-time $80 commission for each activation of Video Services and each analog cable service customer upgrading to Digital Video Services;

(b.)    For Cable Company's video services, Defendant Cable Company was required to pay to Plaintiff DGS a one-time $25 commission for each activation of HDTV Services and each upgrade from Video Services to HDTV Services;

(c.)    For Cable Company's High Speed Internet Services, Defendant Cable Company was required to pay to Plaintiff DGS a one-time commission of $80 for each activation of High Speed Internet Service;

(d.)    For Cable Company's High Speed Internet Services, Defendant Cable Company was required to pay to Plaintiff DGS a one-time commission of $25 for each upgrade of an existing High Speed Internet Services customer to a "higher tier" of High Speed Internet Services; and

(e.)    For Cable Company's Telephone Services, Defendant Cable Company was required to pay to Plaintiff DGS a one-time commission of $80 for each activation of Telephone Services.

34.    The Agreement requires Defendant Cable Company to provide to Plaintiff DGS a detailed report of all DGS Sourced Customers who registered for, added or upgraded a Cable Company Service or any or all Cable Company Services.

35.    Under the "pay for performance" business model, Plaintiff DGS was only paid by Defendant Cable Company when Defendant Cable Company reported that a customer order had resulted in a customer install, sometimes called an "activation."

36.    To this end, Plaintiff DGS was at the complete mercy of and relied completely in good faith upon the honesty, truthfulness and accuracy of Defendant Cable Company's reporting of the installation of DGS Sourced Customers.

37.     Defendant Cable Company was obligated to report to Plaintiff DGS which customer orders/customer leads resulted in an activation and then Defendant Cable Company was obligated to pay commissions to Plaintiff DGS from which Plaintiff DGS would begin to recover its costs.

38.     In the course of procuring the customer lead/customer order, Plaintiff DGS would have already spent its capital in developing the website, incorporating Defendant Cable Company's latest products and price offerings by region, training call center agents on the offers and value proposition of Defendant Cable Company's services, paying for the telecom costs to take the Defendant Cable Company's calls, paying *Google* and other search engines for the paid search clicks and paying its other costs associated with acquiring the customer lead/customer order.

39.     Plaintiff DGS discovered that it had misplaced its reliance and good faith upon the honesty, truthfulness and accuracy of Defendant Cable Company's unilateral reporting of DGS Sourced Customers for whom Defendant Cable Company was required to pay commissions to Plaintiff DGS.

40.     For example, Defendant Cable Company self-reported to Plaintiff DGS that for 2013, only 24.79% of customer leads/customer orders generated by Plaintiff DGS installed services as DGS Sourced Customers.

41.     Defendant Cable Company self-reported to Plaintiff DGS that for 2014, through the first three quarters, the install rate of 26.49%.

42.     Upon information and belief, in some instances, the exact number unknown, DGS customer leads/customer orders provided to Defendant Cable Company which became DGS Sourced Customers for which commission was due to Plaintiff DGS, were purposefully

"recoded" or entered as sourced by Defendant Cable Company by and through its customer representatives who were calling to schedule an installation and/or calling to confirm the order.

43.     Further, upon information and belief, in some instances, Defendant Cable Company failed to use the required "commercially-reasonable efforts" to turn DGS customer leads/customer orders into DGS Sourced Customers for which commissions are due from Defendant Cable Company to Plaintiff DGS, including, without limitation, a failure to contact the customer lead/customer order within 24 hours and following up with additional contact attempts.

44.     Plaintiff DGS had no way of knowing exactly how many DGS customer leads/customer orders became DGS Sourced Customers for which Defendant Cable Company was liable to pay commissions to Plaintiff DGS under the Agreement.

45.     At some point, believed to be at or near the end of 2013, in order to continue perpetrating its scheme to underreport or understate the number of DGS Sourced Customers and/or in order to conceal its defalcations, Defendant Cable Company deflated the reported percentages by unilaterally (and without notice to Plaintiff DGS) changing how the formulae was computed to determine the percentage of DGS Sourced Customers.

46.     Due to the severely low number of DGS Sourced Customers whom Defendant Cable Company asserts installed Cable Company Services, Plaintiff DGS conducted an analysis of the industry-wide standard for sourced customers who registered for a provider's services. Additionally, Plaintiff DGS conducted a sampling of customer leads/customer orders which Plaintiff DGS had communicated to Defendant Cable Company and which Defendant Cable Company had asserted no commission was due to Plaintiff DGS. Based on the analysis, it appears that Defendant Cable Company either does not have proper internal controls in place to

report accurately DGS Sourced Customers whom registered for Cable Company Services or that Defendant Cable Company intentionally, fraudulently and without justification severely unreported and underpaid Plaintiff DGS. Because the sampling tested only a small portion of the DGS Sourced Customers for which Defendant Cable Company contends did not install Cable Company services and the fact that the industry-wide standard is much greater than Defendant Cable Company self-reported, the amount of Defendant Cable Company's underpayment over the years is believed to be over $550,000.00.

47.    Plaintiff DGS had communications with Defendant Cable Company about the commissions due to Plaintiff DGS, and the severe underreporting and non-reporting by Defendant Cable Company of DGS Sourced Customers.

48.    In response, Defendant Cable Company admitted that it had failed to accurately report DGS Sourced Customers and failed to pay commissions, and wrote to Plaintiff DGS that "Suddenlink [Defendant Cable Company] agrees that its reporting on connects resulting from DGS's efforts over the last few months has been erroneous and underreported."

49.    Over a period of several months, Plaintiff DGS and Defendant Cable Company continued to try to reconcile the amount of underreporting. In an effort to mislead Plaintiff DGS, Defendant Cable Company continued to manipulate the formulae and not include the number of product orders which Plaintiff DGS submitted to Defendant Cable Company, it further refused to make any due inquiry after several months of delay. Such a representation is false and was knowingly made to mislead Plaintiff DGS from making further inquiry into the defalcations and misconduct of Defendant Cable Company.

50.    Further, on or about October 31, 2014, Defendant Cable Company purported to terminate the Agreement.

51.     As and for one of the reasons for terminating the Agreement, Defendant Cable Company represented and stated to Plaintiff DGS that Defendant Cable Company was no longer interested in pursuing the "marketing channel" for the Cable Company Services through on-line services and Defendant Cable Company further indicated that it in no way was dissatisfied with Plaintiff DGS's performance and that the termination was part of a strategic direction which the Defendant Cable Company was taking and which would impact all companies similar to Plaintiff DGS.

52.     Upon information and belief, Defendant Cable Company's statement was false and knowingly made to mislead Plaintiff DGS for the purpose of Defendant Cable Company to "prop up" or support the woeful reported numbers and to induce Plaintiff DGS into believing that the low numbers which Defendant Cable Company reported to Plaintiff DGS were in some way related to the on-line "channel" of marketing rather than related to the fact that Defendant Cable Company misrepresented, concealed and falsely underreported the number of DGS Sourced Customers for which Plaintiff DGS is entitled to commissions.

53.     Despite the repeated efforts of Plaintiff DGS to obtain true, accurate and complete information from Defendant Cable Company, Defendant Cable Company has failed and refused to provide same and to pay Plaintiff DGS the commissions due and owing it under the Agreement for any and all DGS Sourced Customers.

54.     Defendant Cable Company is uniquely possessed of all the necessary information from which Plaintiff DGS may obtain a true, accurate and complete accounting to determine a precise amount due and owing Plaintiff DGS for commissions for the DGS Sourced Customers.

55.     As a result of the foregoing, Plaintiff DGS has been forced to retain counsel to attempt to collect overdue amounts from Defendant Cable Company.

56.     Pursuant to Section 3 of the Agreement, Defendant Cable Company "further agrees to pay DGS's costs in ***collecting any overdue amounts*** due by MSO [Defendant Cable Company] under this Agreement, including but not limited to attorney fees, disbursements and costs." (Emphasis added).

57.     Further, pursuant to Section 3 of the Agreement, "[i]f any payment by MSO [Defendant Cable Company] becomes more than 14 days overdue, DGS shall have the right to charge MSO [Defendant Cable Company] monthly interest of 1.5% for any overdue amounts, which interest shall be compounded daily."

## COUNT I

### *(Accounting and Constructive Trust)*

58.     Plaintiff DGS restates and realleges paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59.     This is a claim for full and complete accounting under the equitable powers of the Court because the circumstances render it just and reasonable for the Court to order such an accounting.

60.     Plaintiff DGS, pursuant to Rule 53, Federal Rules of Civil Procedure, requests that the Court appoint a Master as set forth herein.

61.     The Court should impose a constructive trust on all funds held by Defendant Cable Company due and owing to Plaintiff DGS.

62.     Defendant Cable Company has control of money belonging to Plaintiff DGS.

63.     The determination of what is justly due to Plaintiff DGS necessarily involves long and difficult computations of damages and inquiries into information solely in the possession of Defendant Cable Company, and not in possession of Plaintiff DGS.

64.     Under the Agreement, "before the 15th day following the end of each calendar month, MSO [Defendant Cable Company] shall submit to DGS a report detailing the DGS Sourced Customers (the "Commission Report")." Exhibit A to the Agreement. This was the sole source of Plaintiff DGS's information concerning the commissions Defendant Cable Company was required to pay to Plaintiff DGS.

65.     Plaintiff DGS believes, even with liberal discovery, it cannot reasonably be expected to ascertain the full amounts due from Defendant Cable Company to Plaintiff DGS.

66.     Under the Agreement, the entirety of the responsibility for accurate, full and honest accounting and payment to Plaintiff DGS rests with Defendant Cable Company and, as a result, Plaintiff DGS relied entirely upon the honesty, accuracy, and truthfulness of Defendant Cable Company in fulfilling said obligations under the Agreement. As set forth above, Defendant Cable Company has already admitted that it has failed to properly, honestly, accurately and truthfully report DGS Sourced Customers and commissions due to Plaintiff DGS.

67.     As set forth above, whether through fraud, oversight, incompetence, negligence or any combination thereof, Defendant Cable Company has severely and consistently underreported the number of DGS Sourced Customers for which Plaintiff DGS is entitled to commissions, in an amount believed to be in excess of $550,000.

68.     The issues in this lawsuit are so complex, numerous and distinct and the evidence that would be needed to sustain them so variant, technical and voluminous, that it may be difficult for a finder of fact to follow and decipher.

69.     As a result, Plaintiff DGS requests that, pursuant to Rule 53, Federal Rules of Civil Procedure, that the Court appoint a Master for, among other things, "the need to perform

an accounting or to resolve a difficult computation of damages." Rule 53(a)(1)((B)(ii). Such Order should also include the requirement that Defendant Cable Company provide a full, complete, honest and accurate accounting to Plaintiff DGS.

70.     Additionally, Plaintiff DGS requests that discovery issues herein be referred to said Master, with all the powers and duties as set forth in Rule 53.

71.     An accounting is required from Defendant Cable Company for sales of all Cable Company Services to customers who were provided to or referred to Defendant Cable Company by Plaintiff DGS through customer leads/customer orders and/or DGS Sourced Customers.

72.     Accordingly, an order for accounting is necessary to ensure that Plaintiff DGS is justly compensated for its damages, believed to be in excess of $550,000.00.

73.     Further, the Court should impose a constructive trust upon said funds and hold same for Plaintiff DGS until such time as the Court enters its Order awarding the monies to Plaintiff DGS.

**WHEREFORE**, Plaintiff DGS prays that the Court enter judgment in its favor against Defendant Cable Company on Count I of this Complaint for the following:

(a.)     Appointing a Master for the purposes and with all of the powers set forth in Rule 53, Federal Rules of Civil Procedure including, without limitation, to supervise the discovery of information from Defendant Cable Company and to provide a full, true, complete and honest accounting of all amounts due and owing to Plaintiff DGS;

(b.)     Awarding Plaintiff DGS an amount equal to all commissions determined to be due and owing to Plaintiff DGS in amount to be established at trial but believed to be in excess of $550,000.00;

(c.)    Awarding Plaintiff DGS its costs and disbursements, including any amounts required to be paid to the Master appointed by the Court;

(d.)    Awarding Plaintiff DGS 1.5% per month, compounded daily, as and for interest on any and all amounts found due and owing to Plaintiff DGS;

(e.)    Awarding Plaintiff DGS its attorneys' fees incurred herein and incurred in all efforts by Plaintiff DGS in collecting the amounts due and owing under the Agreement;

(f.)    Imposing a constructive trust against Defendant Cable Company in favor Plaintiff DGS on all amounts found to be justly due and owing to Plaintiff DGS; and

(g.)    Entering such other and further orders or relief as the Court may deem just and proper in the premises.

## COUNT II

### *(Breach of Contract)*

74.    Plaintiff DGS restates and realleges paragraphs 1 through 73 of this Complaint as if fully set forth herein.

75.    The Agreement is a valid, enforceable, and binding agreement between Defendant Cable Company and Plaintiff DGS.

76.    Plaintiff DGS has performed all conditions precedent and all obligations required of it under the Agreement.

77.    The Agreement provided that Defendant Cable Company would pay commissions to Plaintiff DGS for all DGS Sourced Customers whom installed Cable Company Services.

78.    The Agreement further provided that Defendant Cable Company would use "commercially-reasonable efforts" to follow up on all DGS Sourced Customers provided to

Defendant Cable Company to install Cable Company Services for all customer leads/customer orders and/or DGS Sourced Customers.

79.     Throughout the period of the Agreement, Defendant Cable Company breached the Agreement by failing to pay to Plaintiff DGS all commission due and owing.

80.     Further, upon information and belief, Defendant Cable Company breached the Agreement by failing to use "commercially-reasonable efforts" to install Cable Company Services for DGS Sourced Customers.

81.     Despite Plaintiff DGS's repeated demands for full payment of all commissions due and owing Plaintiff DGS under the Agreement, Defendant Cable Company has failed and refused and continues to fail and refuse to pay all commissions due and owing to Plaintiff DGS under the Agreement.

82.     Further, to the extent Defendant Cable Company has not used the aforesaid "commercially-reasonable efforts" to install Cable Company Services for DGS Sourced Customers, Defendant Cable Company has breached the Agreement which has further damaged Plaintiff DGS for lost opportunities.

83.     As a direct and proximate result of the breaches of the Agreement by Defendant Cable Company, Plaintiff DGS has been damaged in an amount to be proved at trial after a full and fair accounting by Defendant Cable Company, but such amount is believed to be in excess of $550,000.00.

84.     Pursuant to Section 3 of the Agreement, "[i]f any payment by MSO [Defendant Cable Company] becomes more than 14 days overdue, DGS shall have the right to charge MSO [Defendant Cable Company] monthly interest of 1.5% for any overdue amounts, which interest shall be compounded daily."

85.     Pursuant to Section 3 of the Agreement, "MSO [Defendant Cable Company] further agrees to pay DGS's costs in collecting any overdue amounts due by MSO [Defendant Cable Company] under this Agreement, including but not limited to attorney fees, disbursements and costs."

**WHEREFORE**, Plaintiff DGS prays for judgment in its favor against Defendant Cable Company on Count II of this Complaint for such damages believed to be in an amount in excess of Five Hundred Fifty Thousand Dollars ($550,000.00), as will be proved at trial, for prejudgment interest there at the contracted rate of 1.5% per month, compounded daily, for post-judgment interest thereon, for costs, expenses and attorneys' fees, and for such other and further relief as the Court deems just and proper in the premises.

## COUNT III

### *(Breach of Duty of Good Faith and Fair Dealing; Tortious Bad Faith)*

86.     Plaintiff DGS restates and realleges paragraphs 1 through 85 of this Complaint as if fully set forth herein.

87.     Inherent and implied in every contract is the covenant of good faith and fair dealing.

88.     The basic meaning of the covenant of good faith and fair dealing is that no party to a contract will do anything to deprive the other of the benefits of the Agreement.

89.     As a result of the Agreement and the relationship that existed between Plaintiff DGS and Defendant Cable Company and the requirement that Plaintiff DGS rely entirely upon the accuracy, honesty and truthfulness of Defendant Cable Company, the express and implied promises made in connection with that relationship, and the acts, conduct and communications

18

resulting in these implied promises, Defendant Cable Company promised to act in good faith toward and deal fairly with Plaintiff DGS, which requires, among other things, that:

(a.)    Each party to the relationship must act with good faith toward the other concerning all matters related to the Agreement and the relationship;

(b.)    Each party in the relationship must act with fairness toward the other concerning all matters related to the Agreement and the relationship;

(c.)    Neither party would take any action to unfairly prevent the other from obtaining the benefits of the relationship;

(d.)    Defendant Cable Company would accurately, truthfully, and honestly account to Plaintiff DGS for all "DGS Sourced Customers" and all commissions due to Plaintiff DGS; and

(e.)    Defendant Cable Company would give Plaintiff DGS's interests as much consideration as Defendant Cable Company would give its own interests.

90.    Defendant Cable Company's actions were wrongful, in bad faith, and unfair and, therefore, were violations of Defendant Cable Company's legal duties. Plaintiff DGS further alleges that Defendant Cable Company breached the covenant of good faith and fair dealing when Defendant Cable Company:

(a.)    Repeatedly, consciously and knowingly underreported the number of DGS Sourced Customers who installed Cable Company Service(s);

(b.)    Repeatedly, consciously and knowingly prevented Plaintiff DGS from obtaining the benefits of the Agreement and the relationship;

(c.)    Terminated the Agreement by representing falsely that Defendant Cable Company was terminating any marketing through the online "channel" of websites

designed to generate customer leads for and/or sales of Defendant Cable Company's Services when, in fact, Defendant Cable Company, upon information and belief, has continued or seeks to continue using the same or similar online "channels" through its own third-parties' marketing of its services which was the subject of the Agreement;

(d.)    Upon information and belief, repeatedly, consciously and knowingly refusing or failing to credit Plaintiff DGS for DGS Sourced Customers when Defendant Cable Company's sales agents accepted commissions or other renumeration by recoding or changing who would receive credit for such DGS Sourced Customers;

(e.)    Repeatedly, consciously and knowingly refusing to account, in full, to Plaintiff DGS;

(f.)    Concealing its defalcations and underreporting by unilaterally and, without notice to Plaintiff DGS, changing the method by which the percentages of successful DGS Sourced Customers were reported to mislead and falsify the required reporting information; and

(g.)    By unilaterally and deceptively changing Defendant Cable Company's reporting mechanism and formulae under the Agreement to fraudulently deflate the "percentages" of Defendant Cable Company's Services which were provided to DGS Sourced Customers.

91.    As a direct and proximate result of Defendant Cable Company's actions, Plaintiff DGS has suffered damages and injury as described herein, believed to be in excess of $550,000.00.

92.    Defendant Cable Company's wrongful actions and defalcations exceed the reasonable and justifiable expectations of Plaintiff DGS.

93.     The actions and defalcations of Defendant Cable Company were done willfully, wantonly, outrageously and without justification and were undertaken with conscious disregard to or with reckless indifference to the rights of Plaintiff DGS. As a result, the imposition of punitive damages is justified in order to punish such conduct and to deter such conduct in the future.

**WHEREFORE**, Plaintiff DGS prays for judgment in its favor against Defendant Cable Company on Count III of this Complaint for such damages believed to be in an amount in excess of Five Hundred Fifty Thousand Dollars ($550,000.00), as will be proved at trial, for prejudgment interest at the contracted rate of 1.5% per month, compounded daily, for post-judgment interest thereon, for punitive damages in a just and proper amount to punish Defendant Cable Company and to deter such conduct in the future, for costs, expenses and attorneys' fees, and for such other and further relief as the Court deems just and proper in the premises.

## COUNT IV

### *(Commissions: Procuring Cause)*

94.     Plaintiff DGS restates and realleges paragraphs 1 through 93 of this Complaint as if fully set forth herein.

95.     Plaintiff DGS was the procuring cause of an unknown number of customers who ordered and installed Defendant Cable Company's Services.

96.     As the procuring cause of those DGS Sourced Customers, DGS is entitled to commissions resulting therefrom in an amount set forth in the Agreement.

97.     Defendant Cable Company has failed, and stated its intention to continue failing, to pay the commissions to which Plaintiff DGS is entitled.

98.     As a direct and proximate result of Defendant Cable Company's failure to pay to Plaintiff DGS the commissions which are due, Plaintiff seeks damages in the amount of all commissions due and owing to Plaintiff DGS, believed to be in excess of $550,000.00.

**WHEREFORE**, Plaintiff DGS prays for judgment in its favor against Defendant Cable Company on Count IV of this Complaint for such damages believed to be in an amount in excess of Five Hundred Fifty Thousand Dollars ($550,000.00), as will be proved at trial, for prejudgment interest at the contracted rate of 1.5% per month, compounded daily, for post-judgment interest thereon, for costs, expenses and attorneys' fees, and for such other and further relief as the Court deems just and proper in the premises.

## COUNT V

### *(Unjust Enrichment/Quantum Meruit)*

99.     Plaintiff DGS restates and realleges paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.    Alternatively, Defendant Cable Company has been unjustly enriched by its failure to pay commissions due to Plaintiff DGS for DGS Sourced Customers whom installed any of Cable Company's Services.

101.    Plaintiff DGS procured, through its efforts, numerous DGS Sourced Customers for Defendant Cable Company for whom Defendant Cable Company installed Cable Company Services.

102.    Defendant Cable Company has failed and refused and continues to fail and refuse to pay Plaintiff DGS for the DGS Sourced Customers for whom Defendant Cable Company installed Cable Company Services.

103.    Additionally, Plaintiff DGS is entitled to commissions and/or payment for all DGS Sourced Customers for whom Defendant Cable Company did not use "commercially-reasonable efforts" to follow up on to register the DGS Sourced Customers for Cable Company Services.

104.    As a result of Plaintiff DGS' marketing efforts on behalf of Defendant Cable Company, Plaintiff DGS solicited and procured DGS Sourced Customers for Cable Company Services for which Defendant Cable Company either did not properly credit Plaintiff DGS or for which Defendant Cable Company did not use the required "commercially-reasonably efforts" to confirm the order and install the Cable Company's Services.

105.    Defendant Cable Company has voluntarily accepted and realized the benefit of the services provided by Plaintiff DGS. The fair value of such services is to be determined by accounting and discovery concerning the DGS Sourced Customers for whom  Defendant  Cable Company installed the Cable Company's Services and/or for those DGS Sourced Customers for whom Defendant Cable Company did not use "commercially-reasonable efforts" to confirm and install Cable Company Services.

106.    Defendant Cable Company's retention of the benefits of Plaintiff DGS' services and efforts, without compensation, is unjust and violates principles of equity and good conscience, all of which caused damage to Plaintiff DGS.

**WHEREFORE**, Plaintiff DGS prays for judgment in its favor against Defendant Cable Company on Count V of this Complaint for an accounting from Defendant Cable Company for all DGS Sourced Customers and commissions due therefor, for such damages believed to be in an amount in excess of Five Hundred Fifty Thousand Dollars ($550,000.00), as will be proved at trial, for prejudgment interest at the contracted rate of 1.5% per month, compounded daily, for

post-judgment interest thereon, for costs, expenses and attorneys' fees, and for such other and further relief as the Court deems just and proper in the premises.

## COUNT VI

### *(Fraud)*

107.    Plaintiff DGS restates and realleges paragraphs 1 through 106 of this Complaint as if fully set forth herein.

108.    Under the Agreement, the information concerning the DGS Sourced Customers and the commissions due to Plaintiff DGS was exclusively within the knowledge and possession of Defendant Cable Company.

109.    Because the entirety of the reporting and the representations of the honesty, accuracy and truthfulness thereof was in the complete control of Defendant Cable Company, Defendant Cable Company occupied a fiduciary or special relationship with Plaintiff DGS requiring honest, accurate and truthful performance of this obligation under the Agreement.

110.    Plaintiff DGS was thereby required to rely solely upon the honest, accurate and truthful performance of and representations of Defendant Cable Company.

111.    Defendant Cable Company represented to Plaintiff DGS that Defendant Cable Company would report honestly, accurately, and truthfully all DGS Sourced Customers and the amounts of commissions due to Plaintiff DGS.

112.    Defendant Cable Company further represented to Plaintiff DGS that Defendant Cable Company had internal controls and reporting processes which would result in full, accurate, honest and truthful reporting of all DGS Sourced Customers and the amounts of commissions due to Plaintiff DGS.

113.    Further, Defendant Cable Company represented to Plaintiff DGS that Defendant Cable Company would use "commercially-reasonable efforts" to confirm and install DGS customer leads/customer orders for which Plaintiff DGS would be entitled to commissions.

114.    As a result of the foregoing, Plaintiff DGS relied, and such reliance was reasonable, upon the representations and promises of Defendant Cable Company concerning the ability to and the promise to honestly, accurately and truthfully report all DGS Sourced Customers and the amounts of commissions due to Plaintiff DGS.

115.    Plaintiff DGS, relying on the representations set forth above, entered into the Agreement and, further, continued relying upon the accuracy, honesty and truthfulness of Defendant Cable Company's written commission reporting to Plaintiff DGS concerning the DGS Sourced Customers.

116.    In furtherance of its fraud and defalcations as aforesaid, and as further indicia and badge of fraud, Defendant Cable Company, unilaterally and without notice to Plaintiff DGS, changed the formulae by which percentages were calculated in order to conceal Defendant Cable Company's fraudulent scheme and fraudulent underreporting of DGS Sourced Customers and commissions due to Plaintiff DGS.

117.    The aforesaid representations were material and were false as set forth herein; were either known to be false or were recklessly made without knowledge of their truth or falsity; and were made with the intent they should be acted on by Plaintiff DGS in a manner reasonably contemplated.

118.    Plaintiff DGS was ignorant of the truth or falsity of the aforesaid representations; and Plaintiff DGS had a right to rely thereon and did, in fact, rely thereon, as more fully set forth herein.

119.    The aforesaid representations were false and untrue in that:

(a.)    Defendant Cable Company knowingly and falsely underreported the number of DGS Sourced Customers;

(b.)    Defendant Cable Company knowingly and falsely underreported the amount of commissions due to Plaintiff DGS;

(c.)    Defendant Cable Company knowingly and falsely caused or allowed its customer service representatives to change or alter certain codes or Cable Company Services to avoid paying Plaintiff DGS the commissions due; and

(d.)    Defendant Cable Company attempted to conceal its actions and provided numerous fraudulent and false statements of commission due to Plaintiff DGS.

120.    As a direct and proximate result of the foregoing, Plaintiff DGS has been damaged greatly, in an amount believed to be in excess of $550,000.00.

121.    The actions and defalcations of Defendant Cable Company were done willfully, wantonly, outrageously and without justification and were undertaken with conscious disregard to or with reckless indifference to the rights of Plaintiff DGS. As a result, the imposition of punitive damages is justified in order to punish such conduct and to deter such conduct in the future.

**WHEREFORE**, Plaintiff DGS prays for judgment in its favor against Defendant Cable Company on Count VI of this Complaint for such damages believed to be in an amount in excess of Five Hundred Fifty Thousand Dollars ($550,000.00), as will be proved at trial, for post-judgment interest thereon, for punitive damages in a just and proper amount to punish Defendant Cable Company and to deter such conduct in the future, for costs, expenses and attorneys' fees, and for such other and further relief as the Court deems just and proper in the premises.

**RULE 38, FED. R. CIV. P. JURY TRIAL ENDORSEMENT AND DEMAND**

PURSUANT TO RULE 38 OF THE FEDERAL RULES OF CIVIL PROCEDURE,

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY OF ANY AND ALL ISSUES TRIABLE

BY RIGHT OF JURY IN THE ABOVE ACTION.

Dated this 7th day of December, 2015.          Respectfully submitted,


/s/ Roscoe C. Howard, Jr.
Roscoe C. Howard, Jr.
(DC Bar 246470)
Barnes & Thornburg
1717 Pennsylvania Avenue N.W.
Suite 500
Washington, D.C. 20006-4623
P: 202-371-6378
F: 202-289-1330
roscoe.howard@btlaw.com

Michael Sullivan, Esq.
*(Pro Hac Vice Pending)*
Ashcroft Law Firm
200 State Street
7th Floor
Boston, MA 02109
P: 617-573-9400
F: 617-933-7607
msullivan@ashcroftlawfirm.com